**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

TRACY O.,[1]                                 )
                                             )
    *Plaintiff*,                         )
                                             )
        v.                       )        Civil No. 3:24-cv-304 (REP)
                                             )
FRANK BISIGNANO,[2]                          )
Commissioner of Social Security,             )
                                             )
    *Defendant*.                         )
_____)

## REPORT AND RECOMMENDATION

In this action, Plaintiff Tracy O. seeks review of the Commissioner of the Social Security Administration's ("SSA") decision to deny her Title II application for disability insurance benefits. This matter comes before the Court for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B) on cross-motions for summary judgment. (ECF Nos. 5, 12, 14.) The motions have been fully briefed (ECF Nos. 12, 13, 14, 15), making this matter ripe for review.

Plaintiff moves the Court to vacate the Commissioner's decision denying her social security benefits and remand for a new hearing and decision. (ECF No. 13, at 10.) As the basis for such relief, Plaintiff argues that the Administrative Law Judge's ("ALJ") residual functional capacity ("RFC") determination is not supported by substantial evidence because she failed to properly evaluate the medical opinion of Paulina Essah, M.D. (ECF No. 13, at 6-10.) In response,

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that federal courts refer to claimants by their first names and last initials in social security cases.

[2] Frank Bisignano was sworn in as the Commissioner of Social Security on May 7, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, he has been substituted for the former Commissioner as Defendant in this action. 42 U.S.C. § 405(g). No further action need be taken. 42 U.S.C. § 405(g).

the Commissioner argues that the ALJ properly explained why she found Dr. Essah's opinion unpersuasive. (ECF No. 14, at 16.)

For the reasons set forth below, the Court finds that the ALJ applied correct legal standards in considering Dr. Essah's opinion and that substantial evidence supports the ALJ's RFC determination. Therefore, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 12) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 14) be GRANTED, and the final decision of the Commissioner be AFFIRMED.

## I.    PROCEDURAL HISTORY

On May 12, 2021, Plaintiff filed a Title II application for disability insurance benefits, alleging disability beginning on January 21, 2021. (Administrative Record ("R.") at 65-66.)[3] In her application, Plaintiff alleged that she suffered from a brain tumor and memory problems. (R. at 66.) The SSA denied Plaintiff's claims initially and again upon reconsideration. (R. at 96, 102.) Plaintiff requested a hearing before an ALJ, and one was held on October 12, 2023. (R. at 31-64, 108.)

On November 7, 2023, the ALJ issued a written decision, finding Plaintiff not disabled under the Social Security Act ("the Act"). (R. at 14-25.) On April 2, 2024, the SSA Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (R. at 1-3.) Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

---

[3] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these rules, the Court will exclude personal identifiers from this Report and Recommendation. The Court will further restrict its discussion of Plaintiff's medical information to the extent necessary to result in a proper analysis of the case.

## II.    STANDARD OF REVIEW

The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual has a disability "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." *Id.* § 423(d)(2)(A).

SSA regulations set forth a five-step process to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); *see Mascio v. Colvin*, 780 F.3d 632, 634-35 (4th Cir. 2015) (describing the ALJ's five-step sequential evaluation).  At step one, the ALJ reviews the claimant's current work activity to determine if he or she has been participating in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i).  At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements.  *Id.* § 404.1520(a)(4)(ii).  At step three, the ALJ determines whether the medical impairments meet or equal an impairment listed in the regulations.  *Id.* § 404.1520(a)(4)(iii).  Between steps three and four, the ALJ determines the claimant's RFC, which accounts for the most that the claimant can do despite his or her impairments.  *Id.* § 404.1545(a).

At step four, the ALJ assesses whether the claimant can perform his or her past employment given his or her RFC.  *Id.* § 404.1520(a)(4)(iv).  The burden of proof remains with the claimant through step four of the analysis, and the claimant must prove that his or her limitations preclude the claimant from performing his or her past relevant work.  *See Bowen v. Yuckert,* 482 U.S. 137,

146 n.5 (1987); *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). If such past work can be performed, then benefits will not be awarded, and the analysis ends. *See* 20 C.F.R. § 404.1520(e). However, if the claimant cannot perform his or her past work, the analysis proceeds to step five, and the burden then shifts to the Commissioner to show that the claimant can perform other work that is available in the national economy. *See id.* § 404.1520(a)(4)(v). The Commissioner usually offers this evidence through the testimony of a vocational expert. *See Mascio*, 780 F.3d at 635.

In reviewing a decision to deny benefits, the Court will affirm the SSA's "disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Id.* at 634 (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance of evidence and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *See Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). The substantial evidence standard "presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts." *Dunn v. Colvin*, 607 F. App'x 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)). Thus, a decision by the Commissioner is not subject to reversal merely because substantial evidence would have supported a different conclusion. *Id.*

To determine whether substantial evidence exists, the Court must examine the record as a whole, but may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)); *see Craig*, 76 F.3d. at 589. The Court must consider the support for the Commissioner's decision and "whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v.*

4

*N.L.R.B.*, 340 U.S. 474, 488 (1951)).  If a fact is supported by substantial evidence, the Court must affirm, regardless of whether the Court agrees with such findings.  *Hancock*, 667 F.3d at 476 (citing *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996)).  If the Commissioner's findings are arbitrary or unjustified, then they are not supported by substantial evidence, and the Court must reverse the decision.  *See Breeden*, 493 F.2d at 1007.

### III.    THE ALJ'S DECISION

The ALJ analyzed Plaintiff's disability claim under the five-step evaluation process.  (R. at 14-25); *see* 20 C.F.R. § 404.1520(a)(4); *Mascio*, 780 F.3d at 634.  At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since January 21, 2021 (the alleged onset date).  (R. at 16.)

At step two, the ALJ determined that Plaintiff suffered from the severe impairment of meningioma[4] status post craniotomy.  (R. at 16-19.)  The ALJ found any mental impairments non-severe.  (R. at 17-19.)  Specifically, the ALJ concluded that Plaintiff's "medically determinable mental impairments of depression and neurocognitive disorder [did] not cause more than minimal limitation in [her] ability to perform basic mental work activities and [was], therefore, non-severe." (R. at 17.)  In making that finding, the ALJ considered the four broad areas of mental functioning (commonly called "paragraph B" criteria) and concluded that Plaintiff's "medically determinable mental impairment cause[d] no more than 'mild' limitation in any of the functional areas."[5]  (R. at 19.)

---

[4] A meningioma is a benign, slow-growing tumor "that grows from the membranes that surround the brain and spinal cord." *Meningioma*, Mayo Clinic (Mar. 29, 2024), https://www.mayoclinic.org/diseases-conditions/meningioma/symptoms-causes/syc-20355643.

[5] The SSA evaluates the effects of a mental disorder on four areas of mental functioning based on a five-part rating scale.  20 C.F.R. Pt. 404, Subp. P, App. 1, § 12.00(F)(2).  An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis in an area.  C.F.R. Pt. 404, Subp. P, App. 1, § 12.00(F)(2)(e).  A marked limitation exists when an

Under the first functional area of "understanding, remembering, or applying information," the ALJ considered Plaintiff's testimony that she could care for her personal needs and hygiene without "special reminders" but needed reminders for other tasks, such as taking medications. (R. at 17.) She also acknowledged that Plaintiff exhibited some memory deficiencies before and after her brain surgery but neuropsychological testing between November 2020 and February 2021 produced invalid results, with "results suggesting suboptimal effort on at least some testing measures." (R. at 18.) Neurological testing performed in May 2022 showed Plaintiff having memory scores in the extremely low range but that Plaintiff otherwise "demonstrated good mental flexibility and memory" and could "perform serial mental calculations without errors." (R. at 18.) March 2023 therapy notes indicated that Plaintiff could recall details of previous memory testing and discussed "that her memory [was] likely not as impaired as testing results indicated." (R. at 18.) Based on this evidence, the ALJ found Plaintiff mildly limited in this area. (R. at 17-18.)

The ALJ also found Plaintiff mildly limited in the second functional area of "interacting with others." (R. at 18.) While the ALJ acknowledged that Plaintiff "d[id] not interact socially like she used to," Plaintiff reported spending time with others, going to the grocery store on a regular basis, and no trouble getting along with others. (R. at 18.) In addition, examination findings noted Plaintiff as having an appropriate mood and affect, an ability to make eye contact, and cooperative behavior. (R. at 18.)

In the third functional area of "concentrating, persisting, or maintaining pace," the ALJ again found Plaintiff mildly limited. (R. at 18.) While Plaintiff alleged difficulty completing tasks

---

impairment seriously limits the ability to do the same. 20 C.F.R. Pt. 404, Subp. P, App. 1, § 12.00(F)(2)(d). Moderate indicates a fair limitation, mild includes a slight limitation, and "no" or "none" means the claimant can function in the area independently, appropriately, effectively, and on a sustained basis. 20 C.F.R. Pt. 404, Subp. P, App. 1, § 12.00(F)(2)(a)-(c).

and paying attention, she also reported that she could drive, grocery shop, read and watch television, pay bills, count change, and manage a bank account.  (R. at 18.)  The ALJ noted that Plaintiff could follow written instructions, although she reported needing to write down spoken instructions.  (R. at 18.)  In addition, although Plaintiff's attention and concentration fluctuated during one neuropsychological evaluation, she could follow commands and answer questions without difficulty.  (R. at 18.)

Under the final functional area of "adapting or managing oneself," the ALJ noted that while Plaintiff reported trouble handling stress and changes in routine, she could take care of her dog with some help, complete light household chores (such as laundry), manage her personal care, and prepare easy meals.  (R. at 18.)  In addition, Plaintiff reported symptoms consistent with minimal depression but stated that medication improved her mood and memory issues.  (R. at 19.)  Thus, the ALJ found Plaintiff mildly limited in this area too.  (R. at 18-19.)

The ALJ concluded: "Because [Plaintiff's] medically determinable mental impairment causes no more than 'mild' limitation in any of the functional areas *and* the evidence does not otherwise indicate that there is more than a minimal limitation in [Plaintiff's] ability to do basic work activities, it is non-severe."  (R. at 19 (emphasis in original) (citing 20 C.F.R. § 404.1520a(d)(1)).)  Although Plaintiff's mental impairments were not severe, the ALJ nonetheless considered them in determining Plaintiff's RFC, and the RFC assessment "reflects the degree of limitation the [ALJ] . . . found in the 'paragraph B' mental function analysis."  (R. at 19.)

At step three, the ALJ concluded that Plaintiff did not have an impairment, individually or in combination, which met or medically equaled a disability listing in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 19.)

The ALJ then determined Plaintiff's RFC. (R. at 19-23.) Based on the record, the ALJ found that Plaintiff retained the ability to perform the full range of medium work as defined in 20 C.F.R. § 404.1567(c). (R. at 19.) In arriving at the RFC, the ALJ first summarized Plaintiff's subjective complaints. (R. at 20.) Plaintiff testified that she had memory issues relating to a brain tumor. (R. at 20.) As a result, Plaintiff struggled with forgetfulness and feared injuring a patient in her role as a registered nurse. (R. at 20.) Regarding activities of daily living, Plaintiff stated that she "generally stay[ed] close to home" but that she could drive, grocery shop, care for her dog, count change and manage her bank account with help, manage her personal care, complete household chores, and visit family. (R. at 20.)

The ALJ then detailed Plaintiff's medical records pertaining to her impairments. (R. at 20-22.) Plaintiff began reporting memory issues in 2020. (R. at 20.) In October 2020, Magnetic Resonance Imaging ("MRI") revealed a meningioma in her left frontal lobe, which was surgically removed in January 2021. (R. at 20.) Neuropsychological testing between December 2020 and February 2021 revealed that Plaintiff had "intact processing speed, language, and visual-spatial skill" but testing of memory, attention, and executive functions was invalid. (R. at 20.) While Plaintiff only recalled one item out of three and had trouble with serial seven subtractions on exam in September 2021, other neurological examinations throughout that year noted that Plaintiff had fluent speech, exhibited normal comprehension, and could easily obey commands. (R. at 20.)

Examinations in April and May 2022 showed continued difficulty with serial seven calculations and word recall but otherwise contained non-focal neurological findings. (R. at 21.) During a psychological and cognitive status evaluation in May 2022, Plaintiff scored in the very low range on the brief cognitive status examination but otherwise demonstrated good mental flexibility; variable processing speed; good immediate, recent, and remote memory; and an ability

to perform serial mental calculations without error. (R. at 21.)  The psychiatrist concluded that Plaintiff's overall scores could not be interpreted because her cognitive deficits "were possibly over-reported, and that her testing effort was questionable." (R. at 21.)

The ALJ also noted that Plaintiff relocated to Virginia during the period at issue.  (R. at 21.)  Plaintiff established care with new providers, including Dr. Essah, and could "relate many of the details of her medical history."  (R. at 21.)  In July 2022, her first visit with Dr. Essah, Plaintiff reported "significant depression symptoms," but her mental status findings were benign.  (R. at 21.)  Dr. Essah prescribed Plaintiff medication, and Plaintiff noted improvement in her mood at the next examination in September 2022, which again noted Plaintiff's objective mental status as normal. (R. at 21.)

In February 2023, Plaintiff presented for a neuropsychological examination with Daniel Olsen, Psy.D., for "worsening cognitive function."  (R. at 21.)  Plaintiff reported that she could drive and manage her finances and denied any problems with performing activities of daily living or taking medications.  (R. at 21.)  On examination, Plaintiff had some difficulty recalling certain details but could provide a significant amount of information.  (R. at 21.)  Dr. Olsen found the test results unreliable due to inconsistencies in Plaintiff's memory and cognition.  (R. at 21.)  He explained "that if [Plaintiff]'s memory was as poor as testing suggested, she would be unable to recall the details of past evaluations and treatment."  (R. at 21.)  Dr. Olsen opined that any memory deficit was more likely due to depression and recommended therapy.  (R. at 21.)  Thereafter, Dr. Essah considered Dr. Olsen's findings and adjusted Plaintiff's medication.  (R. at 21.)

After considering the evidence, the ALJ found "nothing in the record indicating any recurrent meningioma" and concluded that, given the normal physical examination findings, Plaintiff could perform a full range of medium exertion work. (R. at 21-22.)  The ALJ then

identified inconsistencies between Plaintiff's stated limitations and the medical evidence. (R. at 22.) First, the ALJ noted that the record showed no recurrent or residual brain tumor that could cause Plaintiff's memory difficulties. (R. at 22.) Second, Plaintiff reported a continuing ability to engage in activities inconsistent with memory deficiencies, including the ability to drive, manage her personal affairs, and be independent in her activities of daily living. (R. at 22.) Third, the ALJ emphasized Plaintiff's ability to not only move to a new state but acclimate to that environment, find new medical treatment providers, recount her medical history, and follow up with her medical appointments. (R. at 22.) Thus, the ALJ concluded that "the record suggests [Plaintiff]'s impairments impose some limitations, but the degree of limitation that is consistent with the record has been accounted for in the" RFC determination. (R. at 22.)

The ALJ then considered medical opinions and prior administrative medical findings. (R. at 22.) First, the ALJ considered the findings from two state agency reviewing psychologists: James G. Brown, Ph.D., and Howard Leizer, Ph.D. (R. at 22.) Drs. Brown and Leizer opined in September 2021 and October 2022, respectively, that Plaintiff's depression caused only mild limitations in the "paragraph B" criteria and was a non-severe impairment. (R. at 22.) Both state agency reviewing psychologists referred to evidence that Plaintiff suffered from some concentration and memory problems post-brain surgery but had improved in her cognitive functioning and retained intact abilities in "attention, processing speed, language, visuospatial, and executive functioning." (R. at 22.) The ALJ found these opinions persuasive and highlighted their parallels with the record evidence showing Plaintiff's objective difficulties with memory, her ability to relate details of medical and treatment history, and her independence in daily functioning. (R. at 22-23.)

The ALJ also considered the September 2023 assessment of Dr. Essah—Plaintiff's primary care provider. (R. at 23.) Dr. Essah opined that Plaintiff's short-term memory loss, confusion, and difficulty coping with work stress would "cause limitations ranging from serious to unable to meet competitive standards." (R. at 23.) She stated that Plaintiff would be off task twenty percent of the workday and would be absent from work about three days per month. (R. at 23.) The ALJ found that Dr. Essah supported her opinion by referencing Plaintiff's reported symptoms but determined that Dr. Essah's opinion was inconsistent with the record, including her own clinical records, which showed improvement with medication and generally normal mental status findings with some memory difficulties. (R. at 23.) The ALJ further noted that Plaintiff's subjective complaints were not consistent with the inconclusive memory testing that suggested significant memory and cognitive deficits. (R. at 23.) Therefore, the ALJ found Dr. Essah's opinion "not persuasive." (R. at 23.)

After completing the RFC assessment, the ALJ found at step four that Plaintiff could perform her past relevant work as a registered nurse, as generally and actually performed. (R. at 23-24.) The ALJ alternatively found at step five that additional jobs existed in significant numbers in the national economy that Plaintiff could perform considering her age, education, work experience, and RFC. (R. at 24-25.) Specifically, the ALJ found that Plaintiff could perform the jobs of nurse consultant, laboratory equipment cleaner, door keeper or greeter, or linen room attendant despite her limitations. (R. at 24-25.) Therefore, the ALJ found Plaintiff not disabled from January 21, 2021 (the alleged onset date) through November 7, 2023 (the date of the decision). (R. at 25.)

## IV.    ANALYSIS

As her sole assignment of error, Plaintiff argues that the ALJ improperly weighed Dr. Essah's opinion.  (ECF No. 13, at 6-10; ECF. No. 15, at 1-5.)  Specifically, Plaintiff argues that the ALJ failed to address the factor of consistency and therefore did not adequately explain why she found Dr. Essah's opinion "not persuasive."[6]  (ECF No. 13, at 6-10; ECF No. 15, at 1-5.)  The Court finds no reversible error in the ALJ's decision because the ALJ applied correct legal standards in evaluating Dr. Essah's opinion and substantial evidence supports the ALJ's findings.

### A. <u>Applicable Regulations for Evaluating Medical Opinion Evidence</u>

Under applicable regulations,[7] the ALJ must consider and evaluate the persuasiveness of all medical opinions or prior administrative medical findings from medical sources without deferring or giving any specific evidentiary weight to any medical source.  20 C.F.R. § 404.1520c(a).  Specifically, the ALJ must articulate the "persuasiveness" of all medical opinions by considering five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) "other factors that tend to support or contradict the medical opinion[,]" including familiarity with the other evidence or understanding of disability program policies and requirements.  *Id.* § 404.1520c.

Supportability and consistency are the "most important" factors, and the ALJ must discuss how these factors were considered.  *Id.* § 404.1520c(b)(2).  The regulations define supportability and consistency as follows:

(1) *Supportability*. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her

---

[6] Plaintiff does not challenge the ALJ's analysis of the supportability of Dr. Essah's opinion. (*See* ECF No. 13, at 6-10; ECF No. 15, at 1-5.)

[7] Claims involving medical opinion evidence filed on or after March 27, 2017 are evaluated using a revised regulatory framework.  20 C.F.R. § 404.1520c; (*see also* ECF No. 13, at 6-7; ECF No. 14, at 16).

medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) *Consistency*. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

*Id.* § 404.1520c(c)(1)-(2).  The ALJ may, but is not required to, explain how the other factors were considered.  *Id.* § 404.1520c(b)(2).

### B. Dr. Paulina Essah's Treatment History in the Record

Dr. Essah began treating Plaintiff on July 22, 2022.  (R. at 21, 809-30.)  At the initial visit, Dr. Essah noted that Plaintiff has a history of memory problems that began in 2020 and had gradually declined since 2021.  (R. at 811.)  Dr. Essah reported that Plaintiff had a normal mood and affect on examination, and found Plaintiff required no help with activities of daily living.  (R. at 814, 819.)  Dr. Essah further conducted a depression screening using the PHQ-9[8], with a total score of 15[9], and prescribed Plaintiff medication.  (R. at 818, 828-29.)  However, Dr. Essah concluded that further evaluation was needed and referred Plaintiff to Dr. Olsen in neuropsychology. (R. at 816.)

On September 30, 2022, Plaintiff returned to Dr. Essah for a follow-up appointment.  (R. at 734-55.)  Plaintiff admitted that her mood had been better on medication and that the prescribed dosage was "helping enough."  (R. at 736.)  While Dr. Essah reported that Plaintiff had a normal

---

[8] The PHQ-9, or Patient Health Questionnaire-9, is a "self-administered diagnostic instrument" used to screen, diagnose, monitor, and measure the severity of an individual's depression.  *Shelley C. v. Comm'r of Soc. Sec. Admin.*, 61 F.4th 341, 349 n.4 (4th Cir. 2023); *see also McCray v. Kijakazi*, No. 2:22-cv-00007, 2023 WL 3775067, at *3 n.6 (W.D. Va. June 2, 2023).
[9] "A PHQ-9 score of zero to four indicates none to minimal symptoms; a score of five to nine indicates mild depression; a score of 10 to 14 represents moderate depression; a score of 15 to 19 indicates moderately severe depression; and a score of 20 to 27 indicates severe depression."  *McCray*, 2023 WL 3775067, at *3 n.6 (citation omitted).

mood, affect, and behavior on examination, she described Plaintiff's memory impairment as "unchanged" and noted that Plaintiff had scheduled a neuropsychology appointment with Dr. Olsen. (R. at 736, 738.)  Further, Plaintiff was instructed to return in six months or if her symptoms worsened or failed to improve. (R. at 739.)

On March 6, 2023, Plaintiff returned to Dr. Essah to have a disability form completed. (R. at 707-22.)  Dr. Essah noted that Plaintiff had undergone a neuropsychological evaluation with Dr. Olsen on February 9, 2023, and was scheduled to receive her results on March 14, 2023. (R. at 709.)  Again, Dr. Essah noted Plaintiff's mood, affect, and behavior as normal on examination. (R. at 711.)  Dr. Essah further instructed Plaintiff to return for a follow-up appointment regarding her memory deficit. (R. at 711.)

On March 30, 2023, Dr. Essah again evaluated Plaintiff and noted that she presented with normal mood, affect, and behavior on examination. (R. at 671-94.)  Dr. Essah noted that Dr. Olsen had completed his neuropsychological evaluation, found Plaintiff's "results were unreliable due to inconsistencies in her memory and cognition," suggested that her memory deficit may be due to depression rather than a neurological disorder, and recommended psychiatric and speech therapy. (R. at 674.)  After considering Dr. Olsen's findings, Dr. Essah referred Plaintiff to speech therapy and adjusted her depression medication. (R. at 676.)

## C. **Dr. Essah's Medical Opinion**

On September 19, 2023, Dr. Essah completed a Medical Source Statement. (R. at 23, 831-34.)  In this assessment, Dr. Essah noted Plaintiff's diagnosis of depressive disorder, generalized anxiety disorder, and memory loss as well as checked boxes to identify her resulting symptoms which included a blunt, flat, or inappropriate affect; difficulty thinking or concentrating; and memory impairments. (R. at 831.)

14

She further explained that Plaintiff's "[d]ifficulty with short-term memory, easy confusion, [and] difficulty coping with work stress" resulted in either a "[s]eriously limited, but not precluded" ability to do work-related activities or an inability to meet the competitive standards of work.  (R. at 832-33.)  Specifically, Dr. Essah indicated Plaintiff was seriously limited in her ability to maintain attention for two-hour segments, maintain regular attendance, sustain an ordinary routine without special supervision, and perform at a consistent pace without rest periods.  (R. at 832.)  She also found that Plaintiff would be unable to meet competitive workplace standards in her ability to remember work-like procedures, understand and remember very short and simple instructions, carry out simple instructions, deal with normal work stress, and complete a normal workday and workweek without interruptions from psychologically based symptoms.  (R. at 832.)  When asked to explain the above limitations "and include the medical/clinical findings that support this assessment," Dr. Essah wrote: "Difficulty with short-term memory, easy confusion, difficulty coping with work stress."  (R. at 832.)  Dr. Essah did not attach any medical or clinical findings to her assessment.

Dr. Essah also opined that Plaintiff had deficiencies in concentration, persistence, or pace that would prevent her from performing workplace tasks in a timely manner, and that she would be off task for twenty percent of an eight-hour workday.  (R. at 833.)  Further, Dr. Essah noted that Plaintiff would likely be absent from work about three days per month.  (R. at 833.)  Lastly, Dr. Essah noted that Plaintiff's symptoms had gradually worsened since at least January 21, 2021.  (R. at 834.)

**D.  The ALJ Applied Correct Legal Standards in Evaluating Dr. Essah's Opinion, and Substantial Evidence Supports the ALJ's Determination**

After summarizing Dr. Essah's opinion, the ALJ found it unpersuasive.  (R. at 23.)  While the ALJ acknowledged that Dr. Essah supported her opinion with references to Plaintiff's symptoms, she explained:

> [the] opinion [was] not consistent with the evidence in the record as a whole, including Dr. Essah's own clinical records, which indicate that the [Plaintiff] reported improvement in her mood with medication, and that mental status findings were typically normal, including normal behavior, mood, and affect, and that despite inconclusive memory testing suggestive of significant memory and cognitive deficits, objective mental status findings showed some memory difficulties, but were generally normal, and not to the degree consistent with the symptoms the claimant alleged.

(R. at 23.)  Contrary to Plaintiff's assertion, the ALJ properly considered the consistency of Dr. Essah's opinion.  The ALJ adequately explained that Dr. Essah's opinion was inconsistent with the record as a whole, including Dr. Essah's own clinical records, and then provided examples of those inconsistencies.  (R. at 23.)

Plaintiff argues that "Dr. Essah's clinical findings are a measure of supportability," not consistency.  (ECF No. 13, at 8.)  The Court acknowledges that "it is not entirely clear whether a medical opinion provider's own treatment records impact the supportability factor, the consistency factor, or both."  *Alexander v. Kijakazi*, No. 1:20-cv-1549, 2021 WL 4459700, at *12 (N.D. Ohio Sept. 29, 2021).  The supportability factor looks at "objective medical evidence and supporting explanations *presented by* a medical source" to support his or her medical opinion, while the consistency factor looks to "evidence from *other* medical sources and nonmedical sources in the claim."  20 C.F.R. § 404.1520c(c)(1)-(2) (emphases added).  Dr. Essah's treatment records appear separately from her Medical Source Statement in the record.  (*See* R. at 671-830 (Exhibit 18F, Office Treatment Records, dated 07/22/2022 to 03/30/2023, from Bon Secours Internal Medicine

of Ashland), 831-34 (Exhibit 19F, Treating Source Statement, dated 09/19/2023, from Bon Secours of Internal Medicine of Ashland).)  Thus, it remains unclear whether or not Dr. Essah "presented" those treatment records to support her findings in the Medical Source Statement, or whether those records are more properly considered as "evidence from other" sources in the record. 20 C.F.R. § 404.1520c(c)(1)-(2).  Courts in the Fourth Circuit have previously found a physician's clinical notes "relevant to the 'consistency' of [that physician's medical] opinion with other evidence in the record" under similar circumstances.  *Katie S. v. O'Malley*, No. 5:23-cv-45, 2024 WL 4024360, at *8 (W.D. Va. Aug. 30, 2024), *report and recommendation adopted sub nom.*, 2024 WL 4817151, at *5 (W.D. Va. Nov. 18, 2024) ("The inconsistency between PA Bowler's medical opinion and her own medical observations is a relevant consideration when addressing consistency"); *see also William O. v. O'Malley*, No. 3:23-cv-210, 2024 WL 1376483, at *6-7 (E.D. Va. Mar. 29, 2024) (holding that the ALJ's consistency analysis was sufficient where it was based, in part, on the ALJ's reasoning that a medical opinion was inconsistent with the medical practitioner's own treatment notes).

Regardless of whether properly considered under supportability or consistency, the ALJ did not err in pointing out conflicts between Dr. Essah's Medical Source Statement and her own treatment records.  Dr. Essah opined that Plaintiff's mental impairments, specifically her memory loss issues, would "generally cause limitations ranging from serious to unable to meet competitive standards."  (R. at 23 (citing R. at 832).)  However, Dr. Essah's mental status examinations of Plaintiff were typically normal.  (R. at 23.)  Plaintiff routinely displayed a normal mood and affect as well as normal behavior during her examinations with Dr. Essah from July 2022 to March 2023. (R. at 21 (citing R. at 671-830), 23.)  While Dr. Essah opined that Plaintiff's "symptoms [had] gradually worsened" since January 21, 2021, her own treatment records noted that Plaintiff's

depression improved with medication. (R. at 21 (citing R. at 736, 834), 23.) Moreover, Dr. Essah considered the results of a neuropsychological evaluation by Dr. Olsen where he concluded that Plaintiff's "results were unreliable due to inconsistences in her memory and cognition." (R. at 21 (citing R. at 674).) Thus, the ALJ reasonably found Dr. Essah's opined mental limitations inconsistent with her own treatment notes elsewhere in the record. (R. at 23.) Whether a measure of supportability or consistency, the ALJ could rely on such conflicts between Dr. Essah's Medical Source Statement and her office notes in finding Dr. Essah's opinions unpersuasive.

Moreover, even assuming, without deciding, that the ALJ's consideration of those records more properly belonged under the supportability factor as Plaintiff contends, the ALJ also found Dr. Essah's opinion inconsistent with "evidence in the record as a whole," including evidence that appears *outside* of Dr. Essah's treatment notes.[10] (R. at 23.) In addition to referencing Dr. Essah's treatment notes showing that Plaintiff reported improvement with medication (R. at 21 (citing R. at 736), 23), the ALJ found Dr. Essah's opinion inconsistent with the mental status findings that were typically normal, including normal behavior, mood, and affect. (R. at 23.) The ALJ previously discussed these findings in more detail, noting that not only did Dr. Essah describe Plaintiff as having a normal mood, affect, and behavior (R. at 21 (citing R. at 738)), but other treating providers also reported the same (R. at 18 (citing R. at 363, 368, 384, 388, 419, 430, 445, 590, 597 (normal or appropriate mood and affect))).

---

[10] Plaintiff argues that the structure of the sentence containing the ALJ's consistency analysis, particularly the ALJ's use of the pronoun "which," makes clear that the consistency analysis referred only to Dr. Essah's clinical records and "that no evidence from other medical and nonmedical sources [were] assessed." (ECF No. 15, at 2-3.) However, as discussed below, the ALJ identified specific categories of evidence that she found inconsistent with Dr. Essah's opinions, some of which refer to external sources, such as neurological examinations, performed by medical sources *other* than Dr. Essah. (R. at 23; *see also* R. at 20-21.)

The ALJ also found Dr. Essah's opinion inconsistent with the inconclusive memory testing in the record and other findings that suggested normal memory, or at least no memory issues to the degree alleged by Plaintiff.  (R. at 23.)  As the ALJ previously explained, the medical record contained persistent complaints from Plaintiff of memory problems (R. at 18 (citing R. at 379, 501, 506, 510, 514)), but testing during the relevant period did not support her allegations (R. at 20, 21, 23).  Specifically, the ALJ's decision outlined the following:

- Neuropsychological testing between December 2020 to February 2021 revealing normal processing speed, language, and visual-spatial skill but invalid results for memory and attention testing (R. at 20 (citing R. at 323 ("Memory functions and attention and executive functioning was unable to be interpreted due to validity concerns.  The scores represent a minimum level of ability.  Again this was felt to be invalid.")));

- Neurological examinations performed in 2021 and 2022 showing Plaintiff with fluent speech, normal comprehension, and an ability to understand and follow commands (R. at 21 (citing R. at 324, 328, 401-02, 405, 502, 507, 511, 604));

- A May 2022 psychological evaluation showing Plaintiff with "good mental flexibility, variable processing speed, good immediate, recent, and remote memory" and "able to perform serial mental calculations without errors" but also suggesting very low scores on a brief cognitive status examination, with the examiner explaining that Plaintiff's "cognitive deficits were possibly over-reported, and that her testing effort was questionable, so that the overall scores could not be interpreted" (R. at 21 (citing R. at 608-11)); and

- A February 2023 neuropsychological evaluation where the doctor again "concluded that the results were unreliable due to inconsistencies in memory and cognition" (R. at 21 (citing R. at 664-70)).

Notably, these records all come from sources other than Dr. Essah and provide substantial evidence supporting the ALJ's conclusion that Dr Essah's opinion was inconsistent with the record as a whole.  In other words, even removing the reference to Dr. Essah's office notes from the ALJ's decision, the ALJ still conducted a sufficient consistency analysis and identified examples from other sources that contradict Dr. Essah's findings.

While Plaintiff attacks the ALJ's findings as nothing more than a "generic reference to the record" and faults the ALJ for not citing "specific evidence from other medical and non-medical sources that weighs against or contradicts Dr. Essah's opinion," (ECF No. 13, at 8-9), the ALJ identified specific reasons for finding Dr. Essah's opinion inconsistent with the record which, as discussed above, track earlier more detailed discussions regarding Plaintiff's mental status findings, neurological evaluations, and memory testing. Thus, the ALJ's decision, when viewed as a whole, provides a sufficient narrative explanation of the ALJ's conclusions and a logical bridge connecting the substantial supporting evidence to her conclusions. *See Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (noting that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion"); *Todd A. v. Kijakazi*, No. 3:20-cv-594, 2021 WL 5348668, at *8 (E.D. Va. Nov. 16, 2021) (finding that the ALJ's opinion must be read as a whole).

Plaintiff argues that *William O.*, 2024 WL 1376483, at *7, supports remand in this case. (ECF No. 13, at 8-9.) The Court disagrees. In *William O.*, the Court found that the ALJ erred in failing to consider the consistency between the medical opinion at issue and other medical opinions in the record, which the claimant contended were "highly consistent" with the medical opinion at issue. 2024 WL 1376483, at *4, 7. Here, Plaintiff does not argue that the ALJ failed to consider Dr. Essah's findings alongside other consistent medical opinions but instead contends the ALJ failed to conduct a consistency analysis altogether. The Court finds otherwise for the reasons stated above.

Plaintiff also cites *Jaworski R. v. Kijakazi*, No. 3:20-cv-797, 2022 WL 203749 (E.D. Va. Jan. 6, 2022), *report and recommendation adopted*, 2022 WL 200364 (E.D. Va. Jan. 21, 2022), to support her argument. (ECF No. 12, at 9-10.) That case is also factually distinguishable. The ALJ in *Jaworski R.* merely explained that the medical opinion was not supported by "the medical

evidence as a whole." 2022 WL 203749, at *7. The Court found that the "blanket statement," without a more detailed explanation, did not allow the Court to meaningfully review the ALJ's conclusion that the medical opinion was only partially persuasive. *Id.* Unlike *Jaworski R.*, the ALJ here adequately explained why Dr. Essah's opinion was inconsistent with the other medical evidence in the record by referencing Dr. Essah's own treatment records and the objective mental status findings of other physicians and the unreliable results of the prior neurological examinations. *See John R. v. Kijakazi*, No. 2:22-cv-47, 2023 WL 2682358, at *5 (E.D. Va. Mar. 29, 2023) ("[T]he Court need not engage in any reverse-engineering because the ALJ clearly articulated *why* he concluded [the medical] opinion was not consistent with Plaintiff's medical record, and in doing so, the ALJ appropriately referenced (rather than repeating) his earlier analysis of specific record evidence." (emphasis in original)).[11]

Ultimately, the ALJ properly explained why she found Dr. Essah's opinion unpersuasive, addressing both the supportability and consistency factor. The ALJ identified multiple reasons for finding Dr. Essah's opinion inconsistent with the record as a whole and detailed why that other evidence supported the RFC determination. In doing so, the ALJ built "an accurate and logical

---

[11] Plaintiff's attempts to distinguish the cases cited by Defendant are unavailing. (ECF No. 15, at 3-5.) For example, Plaintiff claims that *Dennis B. v. Commissioner of Social Security*, No. 2:21-cv-612, 2023 WL 2646303 (E.D. Va. Mar. 27, 2023), is inapplicable here because, although the ALJ found the medical opinion inconsistent with the record as a whole, he referenced the record evidence "as noted above." (ECF No. 15, at 4.) In *Dennis B.*, the Court found that the ALJ adequately explained his evaluation of the medical opinion at issue and why it was inconsistent with Plaintiff's treatment records by referencing his summary of and citations to the medical record evidence earlier in his decision. 2023 WL 2646303, at *4 (noting that an "ALJ need not repeat pertinent findings multiple times throughout a ruling for the purpose of supporting individual conclusions" (citation omitted)). While the ALJ here did not include similar "as noted above" language in the consistency analysis, the ALJ previously summarized the relevant medical evidence, including walking through Plaintiff's reports, the mental status findings, and the neurological examination results. The Court can easily trace the path of the ALJ's reasoning, and "the ALJ need only review medical evidence once in [her] decision." *McCartney v. Apfel*, 28 F. App'x 277, 279 (4th Cir. 2002).

bridge from the evidence to [her] conclusion[s]." *Monroe*, 826 F.3d at 189.  Therefore, the Court finds no error.

## V.    CONCLUSION

For the reasons set forth above, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 12) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 14) be GRANTED, and the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to the Honorable Senior United States District Judge Robert E. Payne and to all counsel of record.

### NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_____ /s/ ~~~~

Summer L. Speight
United States Magistrate Judge

Richmond, Virginia
Date: August 8, 2025